**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TEAMSTERS LOCAL UNION NO. 355, | * | |
| 1030 South Dukeland Street | | |
| Baltimore, Maryland  21223, | * | |
| | | |
|      Plaintiff, | * | |
| | | |
| v. | * | Civil Action No. _____ |
| | | |
| ENSINGER PENN FIBRE, INC., | * | |
| 11 Church Snider Street, P.O. Box 160 | | |
| Greenwood, Delaware  19950, | * | |
| | | |
|      Defendant. | * | |

*    *    *    *    *    *    *    *    *    *    *    *    *

# Exhibit 1

**In the Matter of Arbitration Between**

_____

TEAMSTERS LOCAL UNION 355, :  FMCS No.: 211205-02039

    Union,    :  Grievant: Chad Hall

  and      :

ENSINGER PENN FIBRE, INC., :

    Company.   :

_____:

**Before:** Carl C. Bosland, Esq.

**Appearances:**

  For the Union:  Paul D. Starr, Esq.
        Abato, Rubenstein & Abato, P.A.

  For the Company: Donald D. Gamburg, Esq.
        Immon Shafiei, Esq.
        Ogletree Deakins, Nash, Smoak & Stewart, P.C.

**Hearing:**    May 14, 2021
       July 1, 2021

**Closing Briefs:**  September 10, 2021

**Close of Record:**  September 20, 2021

**Date of Decision:**  October 11, 2021

**Type of Grievance:** Discharge

## <u>Award Summary</u>

For the reasons set forth herein, the grievance is sustained. However, reinstatement and backpay are not awarded because Mr. Hall would have been discharged for being under the influence of alcohol at work on October 14, 2020, the day of his discharge.

## Issue

The Parties stipulated that the issue as whether the Company discharged Grievant Chad Hall for just cause and, if not, the proper remedy?

## Background

Prior to his discharge, Grievant Chad Hall was employed for 29 years by Ensinger Penn Fibre, Inc., a manufacturer of sheets and coils of extruded plastic at a production facility in Greenwood, Delaware. The Company and the Union negotiated a CBA effective January 1, 2020, which remains in force through December 31, 2022.

Mr. Hall was hired as a slit operator for the Company on October 2, 1991. In 1997, he transferred to the extraction department as an extrusion operator. The Company terminated Mr. Hall's employment as an extrusion operator on October 14, 2020, for the third instance in less than a month of leaving his workstation without first securing permission from a lead or supervisor, a violation of the Company's extrusion operator break policy.

On or about September 23, 2020, the Company issued Mr. Hall a written warning for excessive breaks/time away from his Line 4 machine on September 21, 2020. Mr. Hall's machine ran out of material and had to be shut down by another operator to avoid disruption to other operators. Mr. Hall was not seen in the vicinity of his assigned machine and had to be paged to return. During the disciplinary meeting, Mr. Hall, who was accompanied by his Union representative, was informed of the results of the Company's investigation, including the number of door keycard entries he incurred compared to others, the estimated scrap loss incurred by the Company as a result of having to shut down Line 4, and the Company's expectations regarding breaks. Mr. Hall explained that he was upset due to personal issues, that he understood the Company's concerns and that there would be no issues with him leaving his machine unless he informed his lead or supervisor that he was taking a break. The Union nor Mr. Hall grieved grieve the written warning.

On October 14, the Company issued Mr. Hall a one-day suspension for an October 12 incident wherein, after reporting to the slitting operation that day, Mr. Hall disappeared from the work area for approximately 4 hours. After being paged to come to the production office, Mr. Hall

explained that he had been sitting in his car upset after having been served with divorce papers that morning. It turns out that Mr. Hall may have been served with divorce papers a day or two earlier.

The third incident that forms the basis of the discharge decision at issue occurred on October 14, 2020. Mr. Hall was assigned to Line 6. To set-up Line 6, Mr. Hall secured the assistance of Mr. Reed, Extrusion Manager. During the blade set-up process, Mr. Reed was initially unable to locate Mr. Hall. Mr. Reed subsequently located Mr. Hall across the street talking with other employees. The incident was captured on the Company's video surveillance. Per the video, Mr. Hall was away from his workstation for approximately 8 minutes. The parties provide additional context regarding the video when explaining their positions. Additionally, the Company was informed that Mr. Hall was seen driving his vehicle in town without clocking out.

On October 14, 2020, the Company had a disciplinary meeting with Mr. Hall and his Union representative. Mr. Hall was initially presented a one-day suspension for excessive breaks/time away from his machine on October 12. The discipline was not grieved by Mr. Hall or the Union. Thereafter, the Company presented Mr. Hall with his termination notice. The original notice, a copy of which was not available, cited two issues that occurred on October 14 as the basis of his termination: (1) excessive breaks/time away from his machine/work area, and (2) leaving company property without clocking out. Based on confirmation of Mr. Hall's representation that he had not left the premises but had loaned his car for use that day by another employee, the Company dropped the second charge and reissued the termination notice based on the charge of excessive breaks/time away from his Line 6 machine/work area.

At the close of the October 14 disciplinary meeting, the Company and the Union was concerned that Mr. Hall was under the influence of alcohol. When confronted, Mr. Hall indicated that he would "walk it off." The Company refused to permit Mr. Hall to drive his vehicle from the Company premises. Mr. Hall was given several alternative options, and he chose to have another employee drive him off the premises.

The Union timely grieved the termination, which the Company denied. Thereafter, the Union invoked arbitration.

## Relevant Contract Language

## ARTICLE 2

The parties agree that the Company shall retain, possess and have the right to exercise all managerial prerogatives, functions, powers, privileges, and authority that the Company possessed prior to the signing of this AGREEMENT, except in those areas where the Company has clearly and specifically relinquished or restricted these rights in this AGREEMENT. The Union hereby recognizes that the entire management of the Employer's operations, which are covered by this AGREEMENT and the direction of the working forces, is vested exclusively in the Employer. This right includes but is not limited to; the management of the operations; determine the hours of work; fix and adjust the number of shifts based on the need of the Company; to set reasonable operational standards for all operations; to maintain discipline among the employees, including the right to make reasonable rules and regulations governing safe practices and discipline; to determine the duties, size and composition of the work force; provided however, that none of the rights contained in this section shall be exercised in a manner which is inconsistent with other express provisions of this AGREEMENT.

## ARTICLE 7

**Section 1. Filing of Grievance.** The term "grievance" as used herein is a complaint of an employee, which involves the interpretation or application of, or compliance with, the provisions of this Agreement. The burden of proof will be on the grieving party, except in cases involving termination. For the purpose of settling any grievance, the following steps and conditions shall govern: Step 1.The aggrieved employee, with the shop steward, shall first seek settlement with the employee's immediate supervisor. Oral resolution of the grievance is encouraged at this step; however, the grievance may be presented in written form. The written grievance presented at this step shall be specific in its contents as to dates, facts, the employee(s) involved, and the provision of the contract or practice alleged to have been violated. It is further agreed to encourage the resolution of grievances within a reasonable time, all grievance shall be presented in within five (5) working days of the employee's knowledge of the occurrence giving  rise to the dispute, or further rights concerning that grievance may be deemed waived. Management's reply shall be within five (5) working days of the conclusion of the meeting held on the grievance and be of the same manner in which the grievance was presented, be it written or oral.

**Step 2.** If the grievance is not resolved under Step 1, it shall be taken up by the Ensinger Penn Fibre Management or designee, within five (5) working days following Ensinger Penn Fibre Management's reply in Step 1, or that grievance shall be deemed resolved in the grievant's favor and the requested remedy applied. The time limits in this step may be extended by mutual agreement between the parties. The written grievance presented at this step shall be specific in its contents as to dates, facts, the employee(s) involved, and the provision(s) of the contract or practice alleged to have been violated. The Ensinger Penn Fibre Management or designee shall meet with the Union Business Agent, the employee and the shop steward, in an attempt to settle the grievance. Ensinger Penn Fibre Management's written reply shall be within five (5) working days of the conclusion of the meeting held on the grievance.

**Section 2. Discharge Grievance.** Complaints regarding the unjust discharge of any Employee will be handled promptly according to the grievance procedure herein provided. Such complaints must be filed within ten (10) working days of the discharge and must be made in writing. The Ensinger Penn Fibre management must review and render a decision on the case within ten (10) working days after receipt of

4

same. The time limits for discharge grievances will be adhered to by the parties, however, a grievant will not be reinstated because the time limits had expired. Upon expiration of the time limits for discharge grievances, the grievance will be moved to the next applicable step.

**Section 3. Selection of an Arbitrator.** Any grievance that has not been settled pursuant to the grievance procedure may be submitted to arbitration by an impartial arbitrator to be selected by mutual agreement of the parties. However, it is understood that if arbitration is not requested within sixty (60) working days of the date the grievance was reduced to writing, the grievance shall be considered resolved. Where the parties have determined arbitration is necessary, the Union shall request no later than fifteen (15) working days following notice of the Company, the Direct of the Federal Mediation and Conciliation Services (FCMS) to submit the names of seven (7) disinterested and qualified persons to act as impartial arbitrator. From the list of seven (7) persons the Company and the Union shall strike alternately one (1) name, with the Union striking first, until six (6) names have been eliminated and the person whose name remains on the list shall be selected to act as impartial arbitrator. The arbitrator is requested to submit the decision in writing within thirty (30) working days after the conclusion of the hearing, subject to the deadline for filing briefs or other pertinent information. The compensation and necessary expenses of the arbitrator shall be borne equally by the Company and the Union. It is understood and agreed that neither party may be compelled to arbitrate more than one grievance at any one arbitration hearing. However, nothing shall prevent the parties from combining to or more grievances for arbitration if they mutually agree to do so in writing.

**Section 4. Powers of Arbitrator.** The arbitrator shall be empowered to make a decision in cases of alleged violation of rights accorded by this Agreement or written supplementary agreement. The arbitrator shall not add to, subtract from, supplement or modify in any way any of the provisions, terms or conditions of this agreement, supplementary agreement or proven past practices. The arbitrator will be limited to determining whether there has been a violation of a specific provision of this agreement, any supplemental agreements or proven past practices as alleged by the grievance. The decision of the arbitrator will be final and binding upon all parties.

**Section 5. Union, Company and Discharge Grievances.** Union and Company initiated grievances shall start at Step 2. A discharge case shall be handled beginning in Step 2 of the grievance procedure. The time limits in Section 2 will apply.

## ARTICLE 12

The right to discharge employees shall remain at the sole discretion of the Company, but no discharge shall be made without just cause, such just cause to mean, among other things, those infractions covered in the employee's handbook, which may subject an employee or group of employees to immediate dismissal and/or other forms of discipline. At the time of discharge, an employee shall be given written notice of the reason for his or her termination. The Employer shall also notify the Union in writing within five (5) days of such termination.

## EMPLOYEE HANDBOOK

**Disciplinary Policies/Procedures**

Consistent and impartial discipline enforcement is undertaken by Management for the purpose of prevention not punishment. These Company rules must be adhered to and appropriate action will be taken toward those workers who refuse to follow them. It is our policy to enforce these rules as consistently as humanly possible. The Disciplinary items listed below are examples of some of the obvious infractions that can occur. However, the following list is not intended to be complete and all inclusive, and unlisted disciplinary infractions may be treated as below.

The Company reserves the right to change old rules and add new rules.

**Major Disciplinary Items**

An employee will be subject to immediate dismissal for committing any of the following acts:
. . . .

4.      Reporting to work while under the influence of alcohol, marijuana or other drugs.

….

8.      Committing a fourth infraction (Level 4) related to the same or different minor disciplinary infractions of Company policy or procedures as outlined below (See Minor Disciplinary Items).

**Minor Disciplinary Items**

Minor violations are infractions that will result in either an oral or written warning being issues (Levels 1 & 2), or time off without pay (Level 3) or dismissal (Level 4).

These minor violations could be classified as major depending upon the circumstances and the frequency of occurrence. Minor Violations are:

1. Single absence, lateness or early leaving.

….

3. Failure to perform satisfactorily.
….

4. Failure to follow instructions.

….

7. Excessive talking, visiting with others on the job.

8. Time away from your job assignment without permission.

**Disciplinary Procedures**

Minor infractions are treated in the following manner:

1st Infraction (Level 1) - Oral Reprimand

2nd Infraction (Level 2) - Written Reprimand

3rd Infraction (Level 3) - Written Reprimand with time off (1 to 5 work days)

4th Infraction (Level 4) - Immediate dismissal

## TIME CLOCK POLICY

All non-exempt employees are required to accurately record all time worked. It is a job requirement that non-exempt employees must "clock in" at the beginning of their shift and "clock out" at the end of work each day.

Employees are expected to clock in as scheduled, report directly to their work area and be prepared to start work.

Employees who clock in and then leave worksite for any non-work related reason will be considered walking off of the job and subject to disciplinary action.

Employees are to "clock out" at the beginning of lunch breaks when they leave the job site and "clock back in" when they return from lunch or when they return after being away from the job site.

Failure to follow the time clock policy may result in disciplinary action.

**Punching In/Punching Out:**

No one should punch in earlier than the 7 minute allowance unless pre-approved by their respective supervisor. There is a 7 minute window for punching in.

All employees must punch out when their scheduled shift ends. There is a 7 minute window for punching out.

Any employee punching in earlier than the 7 minute window and or punching out after the 7 minute window must have prior approval from their respective supervisor to do so. Supervisors will be monitoring punch times and repeated unapproved overtime may result in disciplinary action.

## ATTENDANCE POLICY

Employees are to report for work as scheduled and assigned. Employees are to be at their assigned workplace, ready to work at their assigned starting time each shift. In the event an employee is unable to report to work, they are to report off according to procedures as may be established and communicated from time to time. Absences due to illness for 3 or more consecutive work days require an original doctor slip to return.

## Position of the Company

The Company argues that, in accordance with the CBA and the Employee Handbook, it had just cause to discharge Mr. Hall when, for the third time in less than a month, he walked away from his workstation without notifying his team lead or supervisor during the most critical phase of his machine's procedure, the set-up process, resulting in significant product waste. The Union's assertions that the Company lacked just cause to discharge Mr. Hall are, the Company, argues, without merit, and the grievance should be denied in its entirety.

The Company asserts that on September 21, October 12, and October 14, 2020, Mr. Hall took breaks without notifying his team lead or supervisor as required by Company policy. Extrusion operators, such as Mr. Hall, are permitted to take 10 minute breaks at appropriate times once the machine is running steadily and measurements are set, which generally occurs after the machine's start-up process. According to the Company, the extrusion operator must notify the lead person or supervisor before taking a break.

The Company asserts that Mr. Hall was aware of the break policy. According to the Company, it's break policies are included in its Employee Handbook, Time Clock Policy, and Attendance Policy. The Company contends that Mr. Hall was provided the Employee Handbook, the Time Clock Policy and the Attendance Policy, and acknowledged receiving instruction regarding the proper procedures and requirements for employee breaks, including the requirement that he check-in with his lead or supervisor prior to taking a break.

The Company argues that, notwithstanding his awareness of the break policy for extrusion operators, Mr. Hall consistently disregarded the policy on at least three separate occasions over a

three-week period, September 21, October 12, and October 14, 2020. According to the Company, it investigated each incident.

The Company asserts that, on September 21, 2020, Extrusion Manager Raymond Reed noticed that Mr. Hall's machine had run out of material. To avoid problems with other interconnected machines, Mr. Reed shut Mr. Hall's machine down. According to the Company, after a search of the area failed to locate Mr. Hall, Mr. Reed had him paged to return to his machine. Mr. Hall was away from his machine between five and ten minutes. On his return, Mr. Reed reminded Mr. Hall that he was expected to stay at his machine during his shift. Mr. Reed notified Operations Manager Mark Fischer.

Thereafter, the Company asserts it initiated an investigation of the September 21 incident. The Company interviewed Day Shift Extrusion Lead Pat Morris, who stated that twice that day he had to turn off Mr. Hall's extrusion machine because it had run out of material and Mr. Hall was not at his machine. The Company also reviewed the PDK system, which monitors the entry and exit of facility doors by employees. According to the Company, the investigation revealed that on September 21, Mr. Hall had sixteen entries and exits. For the period September 1 to September 23, Mr. Hall averaged 24.8 entries and exists from the facility while extrusion operators as a whole averaged only 5.2 entries and exits. Finally, to determine the monetary impact of the incident, the Company asserts that it reviewed the shift production log for September 21, which records the activities for each extrusion operator's machine. The Company claims that it incurred a $724.96 loss due to Mr. Hall's absence from his machine in violation of policy.

The Company issued Mr. Hall a level-2 written warning for the September 21 incident. According to the Company, while initially blaming others, Mr. Hall eventually conceded he was away from his machine without authorization and he apologized for the incident. Mr. Hall nor the Union grieved the discipline.

The Company asserts that Mr. Hall was away from his machine without authorization on October 12, 2020. According to the Company, after reporting to his assigned area at 7 am, Mr.

9

Hall disappeared for hours. Supervisor Redmond notified Ms. Nock of Mr. Hall's disappearance. Mr. Reed paged Mr. Hall to report to Mr. Redmon's office, and he showed up 5-10 minutes later. The Company contends that, when questioned by Messrs. Reed and Redmond regarding his whereabouts, Mr. Hall eventually admitted that he had been in his car all morning because he was upset that he had just been served with divorce papers. The next day, the Company claims it initiated an investigation of the October 12 incident by securing statements from Mr. Reed and Mr. Redmond. According to the Company, it decided to issue Mr. Hall a one-day suspension for the October 21 incident, which it planned to issue on October 14.

On October 14, 2020, the Company contends that it learned that Mr. Hall was away from his assigned machine without first notifying his lead or supervisor. Mr. Hall was found outside of the building and across the street taking with other employees. Upon learning of the incident, the Company claims it initiated an investigation. According to the Company, it secured confirmation from Messrs. Reed and Morris that Mr. Hall was away from his machine during the set-up process for approximately 8 minutes without first asking permission. The Company contends that it also received information from Mr. Fischer that he saw Mr. Hall driving in town off Company property during work hours. The Company asserts that it decided to terminate Mr. Hall's employment.

On October 14, 2020, the Company met with Mr. Hall and a Union representative regarding the October 12 and October 14 incidents. The Company initially issued Mr. Hall a one-day suspension for leaving his workstation for over four hours without authorization on October 12. According to the Company, Mr. Hall nor the Union contested the suspension. Thereafter, the Company issued Mr. Hall the Disciplinary Action Form notifying him that he had been terminated for a third instance of excessive breaks/time away from his workstation that afternoon without permission and for leaving the Company property for lunch without clocking out. Mr. Hall denied leaving the grounds, informing the Company that he had lent his car to another employee.

The Company contends that it stopped the meeting to investigate Mr. Hall's claim that he had not left Company premises but lent his car to another employee to run an errand. The Company

confirmed that another employee had been driving Mr. Hall's car that day. The Company claims that it took this development into consideration but ultimately decided that termination was appropriate for Mr. Hall's leaving his work area without permission for the third time in a month. The Company modified the Disciplinary Action Form accordingly and presented same to Mr. Hall and his Union representative. According to the Company, initially Mr. Hall did not deny the allegation but suggested a one-week suspension. Subsequently, the Company claims that Mr. Hall asserted that he had asked Mr. Morris for a break. The Company contends that Mr. Morris had previously confirmed during its investigation that Mr. Hall had not requested a break at that time. At that time, the Union nor the Mr. Hall complained that the termination failed to follow progressive discipline, the Company alleges.

The Company asserts that, during the grievance process challenging Mr. Hall's discharge, the Union did not raise any issue regarding lack of adherence to the Company's progressive discipline guidelines. According to the Company, the Union admitted that it had no legitimate argument against the Company's decision to discharge Mr. Hall but stated that they had no choice but to arbitrate given Mr. Hall's long tenure with the Company. The Union, the Company contends, relied on Mr. Hall's apology and thirty-year tenure with the Company to justify his reinstatement.

Following the grievance meeting, the Company asserts that it conducted a supplemental investigation regarding the October 14 incident. According to the Company, the safety camera video clearly shows Mr. Hall leaving his workstation for nearly eight minutes, during which time five scrap plastic sheets ejected from the machine. Notably, and contrary to his testimony, Mr. Hall does not make a verbal or non-verbal request to anyone regarding going on a break, the Company asserts. Based on yield reports for Line 6, the line Mr. Hall was working on October 14, the Company attributed 214 pounds of waste to Mr. Hall's performance and absences from his position.

The Company argues that the Union failed to demonstrate that Mr. Hall was discharged without just cause. According to the Company, the Union's initial assertion that the Company did not have a break policy was contradicted by its own witnesses, including Messrs. Caparatta and Hall.

Alternatively, the Union asserted for the first time that on October 14 Mr. Hall notified Mr. Morris that he was taking a break by making a physical gesture resembling he was breaking a twig, the Company contends. The Company argues that the evidence is unequivocal that Mr. Hall's claim that he signaled Mr. Morris that he was going to take a break, did not happen. The Company points to the testimony of Mr. Morris, who testified that Mr. Hall did not notify him verbally or physically that he wanted a break. Moreover, video footage from two different camera angles clearly show that Mr. Hall made no physical hand gesture signaling that he needed a break, the Company submits.

The Company argues that it terminated Mr. Hall for his third offense in less than a month of leaving his workstation without permission. According to the Company, contrary to the Union's suggestion, it did not terminate Mr. Hall for leaving his workstation and leaving the Company grounds without clocking out. The Company asserts that, while it initially intended to terminate Mr. Hall on both grounds, based on the Company's confirmation of Mr. Hall's explanation that he lent his car that day for use by another employee, the Company revised the removal to reflect only his leaving his workstation without permission.

The Company argues that it adhered to its progressive discipline framework by exercising its discretion to issue Mr. Hall discipline based on the nature of his violations. According to the Company, the Employee Handbook clearly provides the Company with discretion to choose the level of discipline for minor violations based on  the nature of the violation. Company policy expressly states that "minor violations could be classified as major, depending on the circumstances and the frequency of occurrence." Mr. Caparatta, Jr., acknowledged the Company has the discretion based on the circumstances to issue the level of discipline the Company felt was appropriate, the Company contends. The Company exercised that discretion and applied progressive discipline based on the circumstances of each of the three instances in less than a month that Mr. Hall left his workstation without permission. The Union's attempt for the first time at the arbitration hearing to challenge the Company's application of progressive discipline to Mr. Hall should be rejected, the Company argues.

12

The Company argues that Mr. Hall is not entitled to reinstatement because after-acquired evidence of his alcohol use on Company property is grounds for immediate termination. According to the Company, assuming, arguendo, the Company was found to not have just cause to terminate Mr. Hall, he is not entitled to reinstatement with backpay for being under the influence of alcohol at work on October 14. The Company asserts that witnesses testified that Mr. Hall was acting strange and smelled of alcohol. Mr. Hall admitted to consuming alcohol at work by replying to the Company's concerns that he had been drinking that he would "walk it off," the Company argues. The Company points to Mr. Hall's election to have a co-worker drive him home from work as further evidence that he was under the influence of alcohol while at work. Under Company policy, being under the influence of alcohol at work is a major violation which would have resulted in his immediate termination, the Company contends.

## Position of the Union

The Union argues that the Company's October 14, 2020, discharge of Grievant for excessive breaks/time way from his machine/work area was without just cause. According to the Union, the Company failed to establish that Mr. Hall took an excessive break away from Line 6 on October 14 as charged in his termination notice. Video evidence, the Union asserts, established that on October 14, Mr. Hall took an approximately eight minute break from Line 6. Company policy and practice permits extrusion operators such as Mr. Hall to take ten minute breaks, the Union maintains.

The Company also failed to prove that Mr. Hall was improperly away from his work area on October 14, the Union asserts. According to the Union, consistent with Company policy, Mr. Hall nonverbally communicated with Shift Lead Pat Morris that he was leaving the line for a break. Mr. Hall made a gesture to Mr. Morris with his hands as if breaking a stick in two. The Union asserts that Mr. Hall made the gesture while he was near line 4 and Mr. Morris was near line 1.

The Union argues that the Company failed to rebut Mr. Hall's testimony that he notified Mr. Morris of his intent to take a break. According to the Union, Mr. Morris' testimony that "he did not remember" Mr. Hall non-verbally signaling for a break, does not mean that it did not occur.

The Union further asserts that the serious doubt was cast on the Company's reliance on Mr. Morris, who failed to recognize Company Exhibit 13, a signed written statement purportedly by Morris that Mr. Hall had not asked for a break on October 14. The Union also contends that the camera angle in the additional video footage in Company Exhibits 12 and 23 of October 14 focuses on Line 6, and reveals nothing with regard to whether Mr. Hall, located near line 4, gestured to Mr. Morris, located near line 1.

The weight of the evidence, the Union contends, revealed that Mr. Hall properly notified Mr. Morris that he was taking his afternoon break. Accordingly, Mr. Hall did not commit the infractions alleged, and discharge was therefor without just cause, the Union argues.

The Union argues that, assuming, arguendo, the Mr. Hall took an eight minute break without first notifying Mr. Morris, the Company's discharge of Mr. Hall was without just cause because: (1) as a minor infraction, Company policy required application of progressive discipline which, in this case, warranted a suspension not discharge; (2) the Company failed to warn Mr. Hall that his conduct risked termination and failed to provide him the opportunity to correct such conduct; and (3) mitigating factors militate against a finding of just cause for Mr. Hall's discharge.

According to the Union, Company policy calls for a four-step progressive disciplinary process for minor infraction. Under that Policy, a first infraction warrants an oral reprimand; a second infraction results in a written reprimand; a third infraction results in a written reprimand with 1 to 5 workdays off; and immediate dismissal results from a fourth infraction. On September 21, Mr. Hill incurred his first minor infraction for being away from his job assignment without permission. Mr. Hill incurred his second minor infraction for being away from his job assignment on October 12. Assuming that he was away from his assignment without permission on October 14, under the Policy this was his third minor infraction, which called for his suspension rather than termination, the Union argues. According to the Union, the Company must be held to the letter of its unilaterally promulgated Policy, since that is the document that puts employees – such as Mr. Hall – on notice of what conduct they must maintain, as well as the consequences for failure to abide by the Company's rules of conduct.

14

The Union argues that the Company inappropriately applied language in the Policy that permits the elevation of minor violations into major violations to justify Mr. Hall's termination. The Policy permits the elevation of minor violations into major violations "depending on the circumstances and the frequency of occurrence." Company policy permits immediate discharge for major violations. According to the Union, the Company failed to establish that Mr. Hall's leaving Line 6 for eight minutes on October 14 involved the type of "circumstance" warranting the elevation of his alleged minor violation into a major violation thereby avoiding the third step of progressive discipline and imposing immediate discharge.

The Company's discharge notice to Mr. Hall, the Union asserts, failed to mention aggravating circumstances prompting the Company to treat Mr. Hall's conduct as a major infraction justifying by passing progressive discipline. The reference to "frequency of occurrence" language in the Policy permitting the Company to escape application of progressive discipline does not apply because, based on this nearly thirty year career, the three occurrences relied on by the Company amount to hardly a blip on the radar screen, the Union argues. Moreover, Mr. Hall's approximately eight minute break resulted in no proven adverse consequences to the Company, the Union asserts. The Company's claim that Mr. Hall's brief absence contributed to unmarketable excessive scrap was rebutted by Union witness Mr. Caparatta, contends the Union. Mr. Hall's conduct on October 14, if proven, was a minor infraction as defined in the Policy, and the progressive discipline provisions apply, the Union argues.

The Union asserts that the Company's failed to warn Mr. Hall that his conduct, if proven, risked termination, and the Company failed to provide him the  opportunity to correct his conduct. According to the Union, on October 14, the Company issued Mr. Hall a notice of disciplinary action for October 12 and a termination notice both based on his having been away from his work area. The Union argues that the Company's issuance of both the one-day suspension at the same time it issued the notice of discharge for a separate instance of similar conduct, ran afoul of both the Policy and a fundamental tenet of just cause.

In violation of Policy, which provides that discipline is taken for prevention not punishment, the Union argues that the Company's issuance of two levels of progressive discipline to Mr. Hall on

the same day for the same infraction deprived Mr. Hall of notice of the unacceptable conduct nor gave him the opportunity to prevent or correct it in the future. Similarly, the issuance of suspension and discharge notices to Mr. Hall in the same meeting violated the just cause requirement that the employer provide the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employer's conduct the Union contends.

The Union argues that just cause does not exist considering the nature of Mr. Hall's conduct, his length of service, and the circumstances surrounding Mr. Hall's infractions. According to the Union, Mr. Hall was away from his machine on October 12 because he was distraught as a result of having been served with divorce papers that morning. Rather than offer him the opportunity to go home on unpaid leave, the Company instead issued him a suspension, the Union asserts. Assuming, arguendo, he committed an infraction on October 14, the Union contends that this constituted only a minor infraction, which did not warrant termination. Moreover, the Company ended the career of a nearly thirty-year employee with no history of such conduct, except the more recent three minor infractions, the Union asserts. Given the totality of the circumstances, just cause demands that Mr. Hall deserves the opportunity to correct his conduct, the Union argues.

The Union argues that the Arbitrator should reject the Company's attempt to expand its case for discharge based on the implication that Mr. Hall consumed alcohol at the workplace. According to the Union, Article 12 does not permit such an expansion but limits the issue to the basis of the discharge in the notice of termination. Moreover, most arbitrators will only consider evidence of those reasons for discharge the employer relied on at the time it made the discharge decision, the Union asserts.

The Union argues that the Company lacked just cause to terminate Mr. Hall's employment on October 14, 2020. As a remedy, the Union requests that Mr. Hall be reinstated to his position, with back pay and back benefits less, at worst, a one-day suspension (if the Arbitrator finds that Mr. Hall committed a minor infraction on October 14).

## Discussion

The Arbitrator has been tasked to determine whether just cause existed to terminate Mr. Hall based on his alleged third offense within a month of leaving his workstation to take a break without first notifying his lead or a supervisor.

*Just cause* is referenced in Article 12 of the CBA as a requirement for the Company to discharge an employee. The CBA provides that *just cause* means, "among other things, those infractions covered in the employee's handbook, which may subject an employee or group of employees to immediate dismissal and/or other forms of discipline."

*Just cause* is a well-established principal in private sector labor arbitration. There is no universally accepted definition of *just cause*. Arbitrators have described and applied the doctrine differently. The most widely accepted formulation of just cause is the seven tests devised in the 1960's by the late Arbitrator Carroll R. Daugherty. See Adolph M. Koven & Susan L. Smith, *Just Cause: The Seven Tests, Third Edition* (BNA 2006), Introduction, V.B, p. 27. As originally formulated, the standard is presented in the form of seven questions. A negative answer to any question originally indicated the absence of just cause. Subsequent refinements by Arbitrator Daugherty recognized that a negative response to a question may not be fatal to just cause if the remaining factors can be answered by a strong "yes." John E. Dunsford, *Arbitral Discretion: The Tests of Just Cause, Pt. I*, 42 NAA 23, 28 (1990).

The seven questions formulated by Arbitrator Daugherty are:

(1) RULE AND EMPLOYEE NOTICE: Did the company give the employee forewarning or foreknowledge of possible or probable disciplinary consequenc3es of the employee's conduct?

(2) REASONABLE RULE: Is the rule reasonably related to the orderly, efficient, and safe operation of company business, or the performance reasonably expected of the employee?

(3) INVESTIGATION: Before issuing discipline, did the company make an effort to discover whether the employee actually violated or disobeyed the rule or order of management?

(4) FAIR INVESTIGATGION: Was the company's investigation conducted fairly and objectively?

17

(5)     PROOF: Did the company "judge" investigate and obtain substantial and compelling evidence or proof of the employee's violation?

(6)     EQUAL TREATMENT: Has the company applied its rules, orders and penalties under similar circumstances even-handedly and without discrimination?

(7)     PENALTY: Was the degree of discipline administered by the company appropriate to the seriousness of the employee's proven offense given his/her service record?

See *Just Cause: The Seven Tests, Third Edition*, Introduction, V.B, p. 27-28.

The employer bears the burden of proving just cause for discipline. That includes proof that the level of discipline imposed was appropriate. The standard of proof that an employer is required to meet to establish just cause for discipline is generally preponderance of the evidence. The union bears the burden of proving any affirmative defenses and any mitigating factors. See Theodore J. St. Antoine, Editor, *The Common Law of the Workplace: The Views of Arbitrators, Second Edition* (BNA 2005), §§ 6.9, 6.10.

**Reasonable Rule and Employee Notice**

The Company established the existence of a work rule governing breaks by extrusion operators and that Mr. Hall was on notice of same. The Company's work rule permits extrusion operators to take two ten minute breaks at appropriate times during a shift once the assigned machine they are working is up and running to product specifications and provided the operator secures the approval of the shift lead person or supervisor before going on break. The Union does not challenge the existence or reasonableness of the extrusion operator break rule.

The Company established Mr. Hall was on notice of the extrusion operator break rule. Here again, the Union does not allege that Mr. Hall was unaware of the extrusion operator break policy. Mr. Hall acknowledged his awareness of the extrusion operator break policy during his hearing testimony. Evidence of Mr. Hall's awareness of the break policy also included Company training records, and Mr. Hall's September 23, 2020, uncontested discipline for violating the extrusion operator break policy on September 21.

The Company established that Mr. Hall was aware of the potential or probable disciplinary consequences for violating the extrusion operator break policy. Mr. Hall received a letter of warning on September 23 for violation of the break policy. Mr. Hall did not grieve the letter of

18

warning. Additionally, the record establishes that Mr. Hall attended Company training regarding the extrusion operator break policy where it was explained that the Company could take appropriate disciplinary actions against employees for violations of the break policy and procedures. Finally, the Disciplinary Policies/Procedures section of the Employee Handbook provides that time away from an employee's job assignment without permission was a minor violation that could result in discipline up to discharge or be reclassified as a major violation, which could result in immediate dismissal.

The Union argues that Mr. Hall's discharge was without just case because, in issuing the one-day suspension and discharge notices in the October 14 meeting, the Company failed to notify Mr. Hall that he risked discharge, and, more importantly, failed to provide him the opportunity to correct his September 21 and October 12 conduct concerning time away from his machine without permission.

With respect to notice that he risked discharge for violating the extrusion operator break policy, Mr. Hall's receipt of a second-level written warning for being away from his machine without permission on September 21 is the type of minor discipline that sends a clear signal that the employee has stepped outside the boundaries of acceptable conduct addressed by Brand & Biren cited by the Union. According to Brand & Biren, arbitrators are reluctant to uphold discipline when the employer imposes a suspension or discharge without having previously warned  the employee, except in cases of serious misconduct. That is not the situation in this case. Moreover, as set forth above, Mr. Hall was also put on notice of the possibility of discipline, including discharge, for violating the break policy during training, in Article 12 of the CBA, and in the Employee Handbook.

In terms of notice of the potentiality of discharge, the Union's argument suggests that to satisfy the notice requirement of just cause the Company must warn employees of the potential for discharge for subsequent violations of a policy for which the employee is already on notice and has already received discipline. While not unreasonable, the record is void of evidence of such a requirement in the CBA, the Employee Handbook, or past practice. The Brand & Biren text cannot reasonably be interpreted as recognizing that perfection of the notice requirement of just

cause requires repeated warnings of potential discharge for subsequent violations of the same policy where the employee has already received discipline for violation of that policy and been warned of the consequences of further violations. This is particularly true where, as here, violations of the same policy occur within a short period of time, and, in terms of the written warning and one-day suspension, were not challenged.

**Fair Investigation and Due Process**

The Union does not challenge the fairness of the investigations conducted by the Company regarding the September 21, October 12, and October 14 incidents. In each case, the record establishes that the Company promptly initiated an investigation. Those investigations involved interviewing and securing written statements from witnesses, securing and reviewing records that monitor facility doors and exits of all extrusion operators, review of production logs, and review of video. Mr. Hall nor the Union grieved the written letter of warning or one-day suspension based on an inadequate investigation. The Union did grieve the Company's October 14 discharge of Mr. Hall. However, the Union has not argued that the decision to discharge Mr. Hall was based on a faulty investigation.

The Union nor Mr. Hall has asserted that the Company violated Mr. Hall's procedural due process rights. Again, the written letter of warning and one-day suspension the Company issued to Mr. Hall were not grieved. However, the Company's discharge of Mr. Hall was grieved. The Union has not, however, argued that the Company violated Mr. Hall's right to procedural due process in its termination decision. In each instance of discipline at issue in this case, Mr. Hall was informed by the Company of the charges and afforded an opportunity to tell his side of the story.

With respect to discharge, in addition to leaving his assignment without approval, the Company also originally charged Mr. Hall with leaving the Company premises without clocking out. Mr. Hall explained that he had not left the premises but rather had lent his car to a fellow employee that day to run an errand in town. Mr. Hall's explanation led the Company to stop the disciplinary meeting to investigate his explanation. After confirming with that the employee had indeed borrowed Mr. Hall's car, the Company revised the October 14 discipline by removing the

reference to leaving the premises without clocking out. The Company elected to proceed with discharge for the remaining offense, excessive breaks/tome away from machine/work area. The Company's actions are further evidence that, consistent with procedural due process, Mr. Hall was afforded the opportunity to address the charges, the Company listened, reopened the investigation and, as a result, modified the charges.

**Proof**

A core element of just cause is the requirement that the Company establish that there was sufficient proof that Mr. Hall committed the charged misconduct. See *Just Cause: The Seven Tests, Third Edition*, Ch. 5, pp. 277-278. The standard of proof in a discipline case such as here is by a preponderance of the evidence. *Id.* at p. 311.

The Union argues that the Company failed to satisfy its burden to establish by a preponderance of the evidence that Mr. Hall violated Company Policy by taking excessive breaks or that he was improperly away from his work area on October 14. Regarding excessive breaks, the Union asserts that video verifies that Mr. Hall took an approximately eight minute break on October 14. Company policy provides that breaks are ten minutes in duration. As such, the Union argues that the Company failed to prove the charge in the termination notice that Mr. Hall took an excessive break on October 14.

The Union reads the termination Disciplinary Action notice in two parts: excessive absences and time away from machine/work area. The October 14 DA Form reads:

> **Specific Fibre Policy Violation or Performance Problem:** Exsessive (sic) Breaks/Time Away from Machine/Work Area. On Wednesday, October 14[th], Chad was assigned to Line 6 in the extrusion department for the day. Mid-Afternoon, Ray Reed (Interim Production Manager) noted that Chad had left his work area and could not be located.

The Union's interpretation of the October 14 DA Form is not unreasonable. The forward slash (/) is commonly used to indicate the word "or." Moreover, as confirmed by the video, Mr. Hall's absence from his Line 6 work area on October 14 was approximately eight minutes in duration, which is not excessive given that Company policy allows for ten minute breaks. However, read in context and viewing the document as a whole, it is clear that the Company terminated Mr.

Hall on October 14 for being away from his assigned work area on Line 6 without first notifying his lead or a supervisor, the third such incident in a month.

The Union argues that that the Company failed to prove that Mr. Hall was improperly away from his work area on October 14. According to the Union, in accordance with Company policy, Mr. Hall nonverbally communicated to shift lead Pat Morris that he was leaving for a break. The Union asserts that the Company's witness, Mr. Morris, testified that he did not remember Mr. Hall nonverbally signally he was going to take a break. This does not mean Mr. Hall's signal did not occur, the Union argues. Moreover, Morris disavowed his purported signed statement, casting serious doubt on the Company's reliance on Mr. Morris on this issue, the Union contends. Finally, the Union asserts that the additional video evidence offered by the parties does not capture where Mr. Hall was standing when he signaled Mr. Morris, he was going to take a break.

It is not disputed that Mr. Hall took a break on October 14 and that he was away from his Line 6 assignment for approximately eight minutes during the set-up phase of his machine. The only issue is whether the Company established that on October 14 Mr. Hall did not let Mr. Morris know that he intended to take a break before leaving his work area, as required by Company policy.

The credible record evidence establishes that Mr. Hall did not notify anyone of his intent to take a break on October 14 before he left his Line 6 work area. As support, the Company offered the testimony of Mr. Reed, Interim Extrusion Manager. Mr. Reed was assisting Mr. Hall set up Line 6 on October 14. At some point during the set up process, Mr. Reed looked for Mr. Hall only to discover that he was not in Line 6 work area. Mr. Reed eventually located Mr. Hall across the street talking with the slitters. Mr. Reed reported the incident to Operations Manager Mark Fischer. Mr. Reed testified that Mr. Hall did not notify him that he intended on taking a break. Mr. Fisher promptly followed up with Mr. Morris, Shift Lead, who confirmed that Mr. Hall had not notified him that he was going on break. At the hearing, Mr. Morris confirmed  that he told Mr. Fisher that Mr. Hall did not ask him, verbally or nonverbally, to take a break on October 14.

Finally, video evidence does not show that Mr. Hall requested to take a break on October 14 nonverbally.

The Union argues that Mr. Morris' testimony was unreliable. The Union points to testimony by Mr. Morris that he "did not remember" Mr. Hall non-verbally signaling for a break, as well as his disavowal of his signed, written statement proffered by the Company as an exhibit. Reviewing the hearing transcript, Mr. Morris' lack of memory addresses his writing and signing his purported statement (Company Ex. 13), not whether Mr. Hall requested to take a break non-verbally. While he testified that Mr. Hall has in the past made the gesture to request break, Mr. Morris credibly testified Mr. Hall did not ask him for a break on October 14, whether verbally or by the stick-breaking gesture. Mr. Fischer credibly testified that this is what Mr. Morris told him on October 14.

The record is void of evidence or argument undermining the credibility of Mr. Fischer and Mr. Morris on this critical point. Mr. Hall's self-interest on this issue, in contrast, is manifest.

The Union asserts that the camera used for the additional video footage the parties agreed to enter in evidence would not capture Mr. Hall gesturing to Mr. Morris to signal a break, as Mr. Hall was near line 4 when he made the gesture. Argument is not evidence. Even assuming, arguendo, that multiple cameras did not capture Mr. Hall making the gesture, the making of the gesture to request a break that was not seen or approved by Mr. Morris does not satisfy the Company's extrusion operator break policy. To perfect a request for a break in accord with Company Policy, it was incumbent on Mr. Hall to make sure that Mr. Morris saw him make the gesture and approved of the break request. Mr. Hall's mistaken belief that Mr. Morris saw his gesture and approved of his request does not satisfy Company Policy. Moreover, the mere possibility that Mr. Hall made that gesture out of camera range and that Mr. Morris was mistaken simply does not establish that the gesture was, in fact made to rebut the Company's evidence that a request was not made.

**Equal Treatment**

Mr. Hall nor the Union has challenged just cause based on disparate treatment.

23

**Penalty**

Inherent in the contractual provision that an employee may be disciplined for just cause is the fairness and reasonableness of the penalty. *Just Cause: The Seven Steps, Third Edition*, Ch. 7, p. 443. "Was the degree of discipline administered by the Employer in a particular case reasonably related to (a) the seriousness of the Employee's proven offense, and (b) the record of the Employee in his service with the Employer?" *Id*.

The Union argues Mr. Hall's discharge was without just cause because the Company improperly bypassed progressive discipline. According to the Union, the Company Disciplinary Policy identifies time away from a job assignment without permission (the charge leveled against Mr. Hall for October 14) as a minor violation. For a third minor infraction, the Disciplinary Policy provides the penalty to be a written reprimand with a time off suspension, not discharge. Under the Policy, discharge may result from the fourth infraction of a minor violation. Instead, the Union asserts that the Company improperly treated the October 14 incident as a major infraction warranting discharge.

The Union argues that the Company's reliance on language in the Disciplinary Policy that "minor violations could be classified as a major, depending upon the circumstances and the frequency of occurrence," should be rejected. According to the Union, (1) Mr. Hall's absence on October 14 for fewer than 8 minutes did not result in any proven adverse consequences; (2) the Company's discharge notice treated Mr. Hall's absence as a minor violation; and (3) measured across his nearly thirty year career, the three occurrences do not satisfy the "frequency of occurrence" language relied on by the Company.

With respect to the Union's arguments, the record is void of evidence that the Company's right to exercise its discretion to escalate a minor violation into a major violation "under the circumstances and the frequency of occurrence" requires an adverse consequence from the employee's misconduct. Certainly, a proven adverse consequence as a result of the misconduct could be relevant to the application of the escalation clause, but there is nothing in the record to indicate that it is required. Absent evidence to further clarify the meaning of what

24

"circumstances" would warrant application of the escalator clause, the Arbitrator also agrees that the absence of adverse consequences resulting from employee misconduct is a reasonable factor to consider for application of the escalator clause at issue.

The Arbitrator agrees with the Union that no substantial adverse financial consequence resulted from Mr. Hall's October 14 seven-and-a-half minute absence from his machine. The Arbitrator does not credit the Company's justification for discharging Mr. Hall based on its post-discharge determination that Mr. Hall's performance and eight minute absence resulted in 214 pounds of waste. Mr. Hall was charged with being away from his workstation without permission, not performance deficiencies. And the attribution of 214 pounds of waste to Mr. Hall for October 14 is contradicted by the video, which showed five sheets of plastic that came off Line 6 during his seven-and-a-half minute absence that the Company considered scrap. Nothing in the video suggests that those five sheets collectively weighed anywhere near 214 pounds.

There is nothing in the language of the escalation clause of the Employee Handbook that requires that the "frequency of occurrence" be measured over the term of an employee's career in order for the Company to consider a minor violation a major violation, as argued by the Union. Nor was evidence of past practice introduced to support the Union's contention. Such an interpretation would dramatically restrict the scope of the clause to all but new hires with minimal seniority. There is simply no evidence in the record to give such a limited reading of the plain language of the Handbook.

The Union argues that the Company treated the October 14 incident as a minor violation in the termination notice as evidenced by the unnecessary reference to prior incidents if the Company intended to treat Mr. Hall's October 14 conduct as a major infraction. The Employee Handbook does not prescribe the content of a termination notice where the Company has applied the escalation clause to convert a minor violation into a major violation. In context, it appears more likely that the Company referenced the September 21 and October 14 minor violations in the termination notice as evidence of "frequency" of conduct to justify its application of the escalation clause to Mr. Hall.

The Union argues that the discharge of Mr. Hall was without just cause because the Company deprived him of the opportunity to correct his behavior when it issued him the one-day suspension and the discharge on the same day. Arbitrators have recognized that providing an employee an adequate opportunity to correct their behavior is an element of progressive discipline to demonstrate just cause. *Just Cause: The Seven Tests, Third Edition*, Ch.7.II.E.3, p. 498-499. The justification for this requirement was described as follows:

> The concept of a warning implies an opportunity for correction. This in turn implies opportunity for sober reflection and in many cases resolves itself into a question of how much time has elapsed between the warning and the final discharge … It is not permissible to warn and discharge an employee in the same act if not the same breath.

> *Id*. at 498.

At first blush, the Company's issuance of the one-day suspension and discharge in quick succession at the October 14 meeting appears to have failed to afford Mr. Hall a meaningful second opportunity to comply with the extrusion operator break rule before it discharged him. Under different facts, that could easily be the finding. Based on the record evidence in this matter, however, that is not the case.

Mr. Hall failed to take advantage of the opportunity provided to him by the Company to demonstrate compliance with the extraction operator break rule by securing approval before taking a break. The break rule was not a new or complicated requirement, Mr. Hall was trained on it and disciplined for it as a result of his violation of same on September 21. Notwithstanding foreknowledge of what was required of him and the disciplinary consequences for a violation, Mr. Hall engaged in the same misconduct on October 12. Before the Company had time to issue him discipline for that misconduct, Mr. Hall violated the extrusion operator break rule again on October 14.

Mr. Hall's intervening misconduct, not action by the Company, cut-off the opportunity he would have enjoyed to demonstrate compliance after receipt of the one-day suspension. In these circumstances, it is unclear how affording Mr. Hall a greater length of time after his October 12 misconduct would have assisted him to improve his compliance. After the September 21

26

violation, the Company afforded Mr. Hall time to demonstrate compliance, and he violated the same rule on October 12, 21 days later. Mr. Hall's violation of the rule again two days later on October 14 is evidence of an acceleration of his noncompliance rather than a reasonable good faith effort at compliance.

The Company argues that it properly adhered to the progressive discipline framework by exercising its discretion to choose the level of discipline to issue its employees for minor violations based on the nature and frequency of the violation. In addition to the Policy language, the Company's assertion that it had the discretion to issue the level of discipline it felt was appropriate to the circumstances was supported by the testimony of the Union steward. As an example, the Company noted that it issued Mr. Hall a level 2 written letter of warning for his September 21 minor infraction even though it was his first violation and issued him a suspension for the October 12 incident even though it was only his second occurrence. The Union did not challenge the September 21 and October 12 discipline as violative of progressive discipline.

The plain language of the Employee Handbook permits the Company discretion to classify minor violations as major violations "depending upon the circumstances and the frequency of occurrence." Of course, that discretion must be exercised consistent with just cause. The Employee Handbook also provides that discipline is taken by Management "for the purpose of prevention <u>not</u> punishment." (Emphasis added). With that said, the Handbook also identifies instances where misconduct for major violations warrants immediate dismissal indicating that not every act of misconduct warrants corrective discipline short of removal.

The Union argues that the Company did not have just cause to discharge Mr. Hall based on mitigating factors. According to the Union, the Company was heartless in suspending Mr. Hall for the October 12 incident rather than offering him leave given his emotional devastation after receiving divorce papers that morning. The Union also argues that Mr. Hall's nearly thirty years of good service trump the three recent minor violations to warrant a finding that the Company dismissed Mr. Hall without just case.

Arbitrators have addressed the impact of mitigating factors on an arbitrator's review of the discipline imposed by an employer:

> "Just cause" is essentially a standard of reasonableness and fairness. It requires that the penalty imposed must fit the seriousness of the offense and must take into consideration the total circumstances, both those in aggravation and those in mitigation… Indeed, the administration of a disciplinary system without making allowances for long service has often led to the overturing of discharge decisions.
>
> ****
>
> Other factors that may warrant giving an employee a lesser penalty that would otherwise be justified include … acute personal problems such as chronic alcoholism and mental illness.
>
> ****
>
> Finally, there is an area within which management may exercise discretion. As Harry Shulman put it: "[The arbitrator's] power is only to modify penalties which are beyond the range of reasonableness and are unduly severe. If the penalty is within that range, it may not be modified.
>
> *Just Cause: The Seven Tests, Third Edition*, Ch. 7.I.E.2.e, pp. 463-466.

Stated differently, just cause requires more than establishing that an employee engaged in misconduct or that the Company had discretion to impose discipline. Just cause also requires that the Company exercise its discretion to impose discipline that is fair and reasonable taking into consideration the totality of the circumstances.

Based on the totality of the circumstances, the penalty of discharge was unfair and unreasonable. Critically, the record is void of evidence that the Company took into serious consideration Mr. Hall's more than 28 years of apparently discipline free employment with the Company in its discharge decision. Nor is there evidence that the Company considered that Mr. Hall was experiencing acute personal problems throughout the critical three week period as a factor to mitigate the penalty.

As a result of the September 21 incident, the Company was aware that Mr. Hall was undergoing personal problems the severity of which caused him to incur discipline for the first time in 28 years. Subsequently, Mr. Hall held it together for a few weeks without incurring a violation, until October 12, when his personal problems escalated with the service of divorce papers. Mr. Hall

subsequently admitted that after clocking in he remained in his car emotionally devastated by the end of his marriage signaled by his receipt of divorce papers. Whether he received the divorce papers that morning or a day earlier does not obviate that he was distraught about it the morning of October 12. The Company responded by issuing Mr. Hall his second strike, complete with an escalated level 3 penalty of suspension. As support, the Company referenced the prior discipline three weeks earlier. Fair enough. The Company did not, however, mention Mr. Hall's over 28 years of discipline-free service before that. Mr. Hall nor the Union challenged this discipline.

The Company discharged Mr. Hall for being away from his machine for approximately eight minutes on October 14 without first securing permission from Mr. Reed or Mr. Morris. The Company likely knew or should have reasonably suspected that Mr. Hall may still be reeling from the impending dissolution of his marriage. At minimum, the Company could have reasonably exercised its discretion and counted this incident as the third minor infraction warranting a second, lengthier suspension as a last chance before discharge. That option would be in line with the stated spirit of the Company's general approach in the Employee Handbook that discipline should be corrective and not punitive. Doing so would be evidence that the Company seriously considered Mr. Hall's 28 years of good service before the out-of-character events of the preceding few weeks, all of which occurred with the known backdrop of the bottom falling out of his personal life. It would also have saved the Company's 29 year investment in Mr. Hall.

Of course, it may be that the record does not fully reflect Mr. Hall's employment record, including prior discipline he may have received during his lengthy career so that it is not as unblemished as it appears. Additionally, had the Company considered his lengthy career, it may have concluded that discharge was still the appropriate penalty for the misconduct and given the reasons why. That would satisfied just cause. Of course, if, in consideration of his lengthy service, the Company exercised its discretion to treat the October 14 incident as a minor violation and given Mr. Hall a lengthier suspension than he was given for October 12, there is no guarantee that Mr. Hall would not have subsequently incurred another violation which would subject him to discharge. But it would have satisfied just cause.

29

Serious consideration of an employee's entire work record means more than simply being generally aware that Mr. Hall had been employed by the Company for a long time. It means that the Company actually considered Mr. Hall's many years of good employment balanced against his more recent misconduct, its seriousness, and the totality of all of the surrounding circumstances. There is no evidence in the record that occurred. Instead, without any apparent recognition of his lengthy good service or the personal challenges he was experiencing during the critical three week period, at each step the Company rotely exercised its discretion and discharged Mr. Hall for his third minor strike in less than a month. Under the totality of the circumstances in the record, discharge for the October 14 occurrence was unfair and unreasonable.

However, even though this Award would be in Mr. Hall's favor based on the absence of just cause, the discovery immediately following the October 14 post-discharge meeting that Mr. Hall was under the influence of alcohol at work precludes his reinstatement and an award of back pay. The Union is correct that most arbitrators only consider evidence of the reasons the employer relied on at the time of the discharge decision. However, most arbitrators also recognize that post discharge misconduct that is so serious that it would warrant another discharge if the grievant were put back to work renders reinstatement futile. *Just Cause: The Seven Tests, Third Edition*, Ch. 5.I.C.2.d, p. 304, Ch. 5.I.C.3.a.iii, b, pp. 307-308.

In this case, the Employee Handbook classifies being under the influence of alcohol while at work as a major violation warranting immediate dismissal. The record evidence establishes that, at the conclusion of the October 14 discipline meeting, Messrs. Fischer and Caparatta acknowledged that Mr. Hall smelled of alcohol. In response to being told that the Company would not allow him to drive home, Mr. Hall did not deny that he had consumed alcohol but stated that he would "walk it off."  The Arbitrator concurs that Mr. Hall's statement that he would "walk it off" is an admission that he was under the influence of alcohol at work. The record does not reflect that Mr. Hall ever denied that he was under the influence of alcohol while at work on October 14. The Company contends that it would have removed Mr. Hall for being under the influence of alcohol at work in violation of Company policy. The Company's assertion

was not contradicted with evidence that the Company has not removed employees for being under the influence of alcohol while on-the-job.

## **Award**

For the reasons set forth herein, the grievance is sustained. However, reinstatement and backpay are not awarded because Mr. Hall would have been discharged for being under the influence of alcohol at work on October 14, 2020, the day of his discharge.

**Carl C. Bosland, Esq.**
**Arbitrator**